UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| SHARON SELEINE, | ) | No. SA CV 07-01214-VBK |
| | ) | |
| Plaintiffs, | ) | JUDGMENT |
| | ) | |
| v. | ) | (COURT TRIAL) |
| | ) | |
| FLUOR CORPORATION LONG-TERM | ) | |
| DISABILITY PLAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**I**

**<u>INTRODUCTION</u>**

On October 12, 2007, Plaintiff Sharon Seleine ("Plaintiff" or "Seleine") filed suit against Fluor Corporation Long-Term Disability Plan, an ERISA plan ("Plan").

This is an ERISA[1] action for long-term disability ("LTD") benefits pursuant to a benefit plan established by Seleine's employer, Fluor Corporation ("Fluor"). The Plan was funded for disability through a policy issued by Life Insurance Company of North America ("LINA"). The policy contains an "own occupation" definition of disability for

---

[1]   Employee Retirement Income Security Act of 1974, 29 U.S.C. §§1001, <u>et</u> <u>seq</u>.

the first two years of claim and an "any occupation" definition thereafter, to age 65.

After Seleine submitted a disability claim in March 2003, LINA denied the claim.  Seleine filed suit ("Seleine I").  Judge King ruled that Seleine was entitled to benefits under the "own occupation" definition, and remanded to LINA as the claims administrator to determine whether she qualified for benefits under the "any occupation" standard.  The actions taken by LINA will be summarized hereinafter.  In any event, LINA denied Seleine's claim under the "any occupation" definition of disability.  Seleine appealed the denial and submitted additional evidence.  Following further review, LINA upheld the denial on appeal and this lawsuit followed ("Seleine II").

A bench trial was held on November 4, 2008.  The matter was heard on trial briefs submitted by both parties, and, following the court trial, the parties filed supplemental briefs, which the Court has fully considered.  Defendants submitted proposed findings of fact and conclusions of law ("Proposed Findings").  Plaintiff has not filed Objections to the Proposed Findings within the time allotted by the Court.  Based on the evidence presented, and reasonable inferences drawn therefrom, the Court finds in favor of Defendants.

## II

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This opinion constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact which constitutes a conclusion of law is adopted as such, and the converse will also be true.

**A.    Findings of Fact**.

1.    Fluor Corporation ("Fluor") established and maintains an employee welfare benefit plan governed by ERISA. (AR 765.)

2.    Fluor funded the Plan for long-term disability through the purchase of insurance from Life Insurance Company of North America ("LINA").   LINA issued to Fluor Corporation its long-term disability policy number LK-10035 (the "Policy"), effective January 1, 1994, under which Plaintiff's current claims arise.  Fluor's long-term disability plan is known as Fluor Corporation Long-Term Disability Plan ("Plan"), the Defendant in this action. (AR 765.)

3.    Plaintiff was a computer aided drafting ("CAD") designer, and a participant in Fluor's benefit Plan, insured for disability under the LINA Policy.

4.    Under the Policy, disability is determined based on functional capacity.   Benefits are payable to age 65, subject to a 180-day elimination period. (AR 771; 776.)

5.    The Policy contains the following definition of disability: "An Employee will be considered Disabled if because of Injury or Sickness:

1.   he is unable to perform all the material duties of his regular occupation; and after Monthly Benefits have been payable for 24 months, he is unable to perform all the material duties of any occupation for which he is or may  reasonably become qualified based on his education, training or experience." (AR 771.)

6.    The Summary Plan Description ("SPD") confers discretion upon

1          LINA to determine eligibility for benefits and to construe
2          the terms of the Plan. (AR 808-809.)

3    7.    In March 2003, Seleine submitted a disability claim to LINA
4          alleging an inability to work as a result of injuries to her
5          neck, lower back and tailbone.  LINA commenced its claims
6          investigation.

7    8.    Medical  records  from  Seleine's  primary  care  physician,
8          Lawrence Lo, M.D., dated back to October 1994, documented a
9          history of back and neck problems.  The 1996 notes of an
10         orthopedic surgeon, Dr. Steven Dennis, contain a history of
11         her reported complaints.  Despite these complaints, Seleine
12         worked until May 2002. (AR 709-715; 731-739.)

13   9.    Seleine claimed severe pain when sitting and working on a
14         computer or when standing on a regular basis.  She claimed
15         a limited ability to perform household activities such as
16         cooking, cleaning and shopping (for more than ½ to ¾ hours
17         at  a  time).  She told LINA that she read and watched
18         television lying down because sitting caused pain.  However,
19         she noted going to a gym 3-4 times per week for an exercise
20         program to swim and walk on a treadmill.  She took 1 mile
21         walks 4 times per week. (AR 704-705.)

22   10.   Seleine stated she had no difficulty walking, but if she
23         stood for too long, or in one place, she began to experience
24         pain and stiffness, and sitting caused her discomfort after
25         10-15 minutes.  She occasionally took Ibuprofen or Aleve.
26         (AR  131.)  On  4/30/03,  LINA  approved  Seleine's  claim
27         effective 10/30/02.

28   11.   Seleine's chiropractor, Dr. Scott, believed she should be

1    able to return to work in about six months.  According to

2    Dr. Scott, Seleine could occasionally (less than 2.5 hours)

3    sit, stand and walk, but could do no climbing, balancing,

4    kneeling, crawling, crouching or stooping.  Dr. Scott

5    recommended that Seleine take six months off work and then

6    be re-evaluated. (AR 650-651.)

7    12.  Dr. Lo believed Seleine could occasionally sit, stand and

8    walk, reach overhead at desk level and use her lower

9    extremities for foot controls but could never climb,

10   balance, kneel, crawl, crouch, stoop, reach overhead or

11   reach below the waist.  He commented that Seleine could only

12   stand and sit for short periods of time, could not sit or

13   stand continuously for more than 30 minutes at a time and

14   that frequent breaks were required to prevent pain and

15   stiffness. (AR 631-632.)

16   13.  In early September 2003, LINA's medical and vocational

17   rehabilitation departments reviewed the file and suggested

18   a medical peer review because Seleine had worked despite her

19   condition since 1996 and there was no objective testing on

20   file showing any change in her condition that would prevent

21   her from performing the duties of her occupation. (AR 151.)

22   LINA also ordered a Functional Capacities Evaluation ("FCE")

23   and surveillance.

24   14.  The FCE shows that in the floor to waist lift, and waist to

25   overhead lift and pulling, Seleine was in the sedentary

26   level.  In the horizontal lift, push, and front, right, left

27   carries, she was in the medium/light level.  The FCE

28   Physical Abilities Assessment Form indicates that Seleine

1    could frequently (2.5-5 hrs.) sit, crouch and reach below

2    her waist; she could occasionally (less than 2.5 hrs.)

3    stand, climb, stoop and reach overhead and at desk level.

4    She could continuously walk, kneel, and crawl. (AR 580.)

5    Seleine was rated between sedentary and medium physical

6    demand levels and was capable of light work. (AR 579; 581.)

7    15.    According to the FCE, the only restrictions that would

8    prevent Seleine from working in her own occupation were fine

9    manipulation, simple grasp and firm grasp.  However, there

10   was a notation that she did not give maximum effort in these

11   categories during the testing.  Therefore, LINA considered

12   that portion of the testing invalid. (AR 171.)

13   16.    The surveillance showed Seleine's ability to sit, stand,

14   walk and drive.  On the first day of surveillance, Seleine

15   was observed driving to her FCE appointment and then to a

16   mall, where she was lost in traffic; on the second day she

17   was observed driving to Starbucks, a liquor store and then

18   to her FCE appointment and back home; on the third day, she

19   was observed driving to Costco, carrying bags, driving to

20   Ralph's, shopping and placing more bags into her trunk. (AR

21   437-445.)  LINA sought the input of Seleine's doctors on her

22   functional capacity and sent them both the FCE and the

23   surveillance report.

24   17.    In February 2004, LINA's Associate Medical Director, Joseph

25   Doyle, M.D., reviewed the file.  He noted that (i) the FCE

26   showed submaximal effort, resulting in sedentary to light

27   capacity; (ii) the attending physician commented on the

28   FCE/surveillance by providing a lumbar MRI report and

1  deferring to ortho referral; and (iii) the MRI showed bulges
2  but no cord compression or nerve root compression. Dr. Doyle
3  concluded that Seleine did not have an impairment of
4  functional capacity severe enough to preclude her from
5  performing her own sedentary occupation. (AR 554.)   LINA
6  compared the FCE to the Dictionary of Occupational Titles
7  ("DOT") job description and concluded that Seleine retained
8  the ability to perform the material duties of her own
9  occupation. (AR 173.)

10  18.  On February 12, 2004, LINA determined that Seleine was no
11       longer eligible to receive LTD benefits.   The benefit
12       termination letter cites the relevant Policy provisions and
13       the medical and other evidence considered, including the
14       FCE, which found that she could perform a light duty
15       occupation.   Benefits were to be paid through 2/29/04, and
16       she had 180 days to appeal.   A final decision would be made
17       no later than 90 days after the appeal was received. (AR
18       549-552.)

19  19.  On June 8, 2004, LINA received an appeal letter from
20       Seleine's attorney, Charles Fleishman, enclosing medical
21       records, affidavits from Seleine's co-worker and her mother,
22       and an inter-office memorandum from 1991, where Seleine
23       wrote her supervisor regarding her physical problems and the
24       need for ergonomic adjustment of the CAD work stations. (AR
25       492-532.)   Prior to LINA's determination on appeal, Seleine
26       filed a lawsuit on August 10, 2004.

27  20.  LINA paid the claim through the "own occupation" period and
28       commenced payment under the "any occupation" period during

1        its post-remand investigation.

2   21.  LINA received updated medical information and disability

3        forms from Seleine.  These included an Attending Physician's

4        Statement ("APS") by Dr. Lo noting limitations of less than

5        two hours standing, less than two hours walking, 2.5 hours

6        sitting and less than 10 pounds lifting.   In his view,

7        Seleine had a Class 3 impairment (slight limitation of

8        functional capacity, capable of light work). (AR 430-431.)

9   22.  Seleine claimed she could not sit or stand for long periods

10        of time and could not lift or carry very much.  She claimed

11        an ability to perform limited household chores including

12        one-half hour to one hour of shopping 4-5 days a week,

13        attending religious services once or twice a month, walking

14        1-1 ½ miles once or twice a week if feeling up to it, and

15        swimming 2-3 days per week. (AR 434-436.)

16   23.  LINA received a Physical Ability Assessment form from

17        Seleine's chiropractor, Jo Ann Scott, along with recent

18        medical records for the period 6/1/05-4/28/06. (AR 410-425.)

19        In an eight-hour day, Dr. Scott opined that Seleine could

20        frequently walk with breaks and occasionally sit, stand,

21        reach, do fine manipulation and simple grasping, and push

22        and pull up to 10 pounds.   In the comment section, the

23        doctor noted that Seleine's pain level and tolerance for

24        pain varied with her activities.  Sitting and standing for

25        more than 30 minutes at a time caused her low back condition

26        to flare up and her pain causes her to have to lay down in

27        a prone/flat position on a frequent basis. (AR 412-413.)

28   24.  Dr. Lo indicated that Seleine could only occasionally sit,

1       stand and walk - but needed frequent breaks.  He also

2       indicated that she could occasionally perform other

3       activities, including lifting and carrying up to 10 pounds.

4       (AR 399-400.)

5           LINA agreed that additional information was necessary

6       to clarify Seleine's functional capacity and noted that she

7       was only treating with a chiropractor and a PCP and that no

8       surgery had been performed or planned. (AR 398.)  It was

9       thereafter agreed that an independent medical examination

10      ("IME") should be considered for an "any occupation"

11      functionality assessment. (AR 394-395.)

12  25.  At LINA's request, an IME was conducted on June 30, 2006 by

13      Bruce Hector, M.D., Certified Independent Medical Evaluator

14      and Fellow of the American Back Society, who provided his

15      23-page written report and functional assessment form.  Dr.

16      Hector found that Seleine's significant subjective

17      complaints were grossly disproportionate to the objective

18      findings.  To Dr. Hector, Seleine was suffering more from

19      deconditioning than from any significant structural

20      abnormality.  He pointed out that her cervical spine x-rays,

21      lumbar spine x-rays and lumbar MRI scan all revealed only

22      age-related degenerative changes, often asymptomatic in

23      other individuals within her age group.  He noted that

24      Seleine currently relied solely on passive care treatments.

25      (AR 373.)

26  26.  Dr. Hector suggested limitations of no continuous sitting

27      for more than 50 minutes at a time per hour, with a

28      10-minute break from sitting every hour, which tends to

diminish cervical and lumbar spine stiffness. Because
Seleine was so grossly deconditioned, Dr. Hector believed it
appropriate to restrict her from lifting more than 25 pounds
on more than an occasional basis. In his view, there was no
reason she could not engage in bending, stooping and
squatting activities and he believed her fully capable of
fine manipulations, simple grasp and firm grasp. Dr.
Hector's diagnoses were chronic cervical and lumbar
deconditioning with associated myalgia superimposed upon
early degenerative disease of the cervical and lumbar spine,
as confirmed by x-ray findings. Deconditioning was
evidenced on muscle strength testing. (AR 353-377.)

27. Significantly, Dr. Hector's personal observation of Seleine
revealed no difficulty in walking, transfer movements, or in
sitting continuously for a period of 40 minutes. There was
no overt pain behavior such as facial grimacing, muscle
guarding or stiffness. Dr. Hector observed that Seleine's
treatment focused on passive measures, as well as
reinforcement of an inappropriate level of disability. He
stated that chronic use of passive care measures is
inconsistent with current nationally recognized treatment
guidelines such as those from the American College of
Occupational and Environmental Medicine, as well as the
official Disability Guidelines. (Id.)

28. Dr. Hector believed that Seleine could sit continuously
(5.5+ hours); stand and walk frequently (2.5 - 5.5 hours);
lift and carry up to 10 pounds frequently and up to 20
pounds occasionally. (AR 376-377.)

29.   LINA sent copies of the IME report to Dr. Lo and Dr. Scott on July 28, 2006, asking if they agreed or disagreed. (AR 346.)  Dr. Lo initially responded that he agreed with the IME report. (AR 337.) However, 10 days later, he reversed course, stating he disagreed and he had no reason to doubt that Seleine is straightforward and honest. (AR 344-345.)

30.   To explain his recantation, Dr. Lo told LINA the IME report was very long and contained many of his own records, so he was not sure if he was to indicate whether or not he was in agreement with the IME or with his own findings. (AR 62.)

31.   On August 2, 2006, Seleine submitted to LINA her own rebuttal to Dr. Hector's IME report.  She elaborated on her subjective symptoms, and stated that the work Dr. Hector found her capable of performing on a full-time basis with an ergonomic work station, which included no continuous sitting for more than 50 minutes per hour, actually described her work conditions at her regular occupation and it had already been determined that she could not perform those duties.

Seleine found fault with Dr. Hector's statement that she should take responsibility for the performance of an active exercise rehabilitation program, claiming she had already done that for many years and it had not worked.  She acknowledged her degenerative disk disease, which she and her doctors had managed for many years, but claimed she had also experienced several injuries in two car accidents. Further, she felt her other diagnoses of chronic lumbar spondylosis, arthritis and bursitis should be considered in determining her condition. (AR 334-336.)

32.  Surveillance was conducted on September 21-23, 2006. Seleine traveled to a fitness center where she was observed swimming, after which she returned to her residence. Later in the day, she was observed traveling to a condominium complex in San Juan Capistrano and, after a brief stay, returning to her residence. (AR 313-315; 298-305.)

33.  LINA determined that a medical peer review was needed to clarify Seleine's functional capacity. (AR 309-311.) Dan Gerstenblitt, M.D. (internal medicine) prepared his November 8, 2006 report listing the medical records he reviewed, his conclusions and opinions. (AR 284-289.) Like the IME physician, Dr. Gerstenblitt found Seleine's symptoms and reported abilities to be out of proportion to objective findings. She had no neurological deficits and the MRI performed in 2004 was essentially normal for her age. (AR 287.)

34.  Dr. Gerstenblitt opined that the claim was being driven by Seleine's self-reports and self-imposed limitations. There was no medical basis for an inability to perform activities for more than 2.5 hours, except this is the amount of time that she has chosen. (AR 287.) The FCE, IME and surveillance and all the medical documentation support her ability to perform the duties of a full-time sedentary position, and the restrictions assigned by the IME physician were reasonable. (AR 288.) Dr. Gerstenblitt attempted to reach the treating physicians to discuss Seleine's condition, but those attempts were unsuccessful. (AR 288.) LINA received communication from Seleine's counsel

1        indicating that Seleine's doctors had been instructed not to

2        talk on the telephone with doctors hired by LINA. (AR 245.)

3   35.   LINA next ordered a Transferrable Skills Analysis ("TSA"),

4        which was conducted on November 16, 2006.  The purpose of a

5        TSA is to identify the core skill sets of the insured based

6        on her education, training and experience, and determine

7        which of these skills are transferrable to other identified

8        occupations.   Rehabilitation   Specialist   Vince   Engel

9        identified three occupations that Seleine could perform in

10       the labor market of Los Angeles:  detail drafter; examiner

11       (government services) and architectural drafter. (AR 279.)

12       In identifying these occupations, LINA considered the income

13       that Seleine had been earning in her last job, and the pay

14       scale of the alternative occupations identified.  Each of

15       the identified occupations paid more than 60% of her indexed

16       pre-disability earnings, and 2 of the 3 paid over 90%.

17   36.   Based on the above claims investigation, the IME, peer

18       review and the TSA, LINA determined that Seleine was not

19       totally disabled from any occupation.  LINA paid the claim

20       through 11/30/06.  Seleine was notified of the denial of

21       further benefits. (AR 203-207.)

22   37.   Attorney Charles Fleishman appealed on behalf of Seleine.

23       During the appeal, Seleine submitted certain additional

24       information, including an exchange of memos in 1991 between

25       Seleine and a Steve Weideman at Fluor about Seleine's

26       suggestions to provide ergonomic work stations to prevent

27       possible future chronic problems with neck/back strain. (AR

28       245-247.)

38. Seleine also sent LINA a June 1, 2007 neurosurgical consultation report by Jeffrey D. Gross, M.D., who examined Seleine at the request of her lawyer, Mr. Fleishman. (AR 212-223.)   His diagnoses were (1) multiple cervical disc herniations with discogenic cervical pain and features of radiculopathy and possibly myelopathy; (2) multiple lumbar disc herniations and structural changes with spondylolistagsis, mechanical discogenic pain and neural encroachment with radiculopathy; (3) focal right sacroilitis; (4) coccygeal fracture and dislocation with coccygodynia; and (5) related depression/anxiety.   He felt that Seleine was completely and totally disabled from any occupation at present, but that with further treatment, her disability may be mitigated to partial.   He noted that it was her desire to move in that direction and that she hoped to return to at least part-time work with restrictions.   He made some treatment recommendations which included additional testing, epidural injections and then possible surgical intervention. (AR 221.)

39. Dr. Gross conceded that the opinions of the disability evaluator and the reviewing physician were divergent from his own, but he gave his own opinion more weight.   He did, however, agree that more aggressive treatment should be offered to Seleine.   Dr. Gross believed physical limitations should include no sitting or standing for more than 45-50 minutes at a time, not to exceed two and a half to three hours per day; lifting restricted to 10-15 pounds occasionally and 25 pounds rarely, on an as needed basis.

14

1     (AR 222.)

2     40.   Seleine also sent LINA a September 22, 2004 decision by an

3           ALJ at a hearing on appeal of her Social Security denial.

4           The judge found that she had residual functional capacity

5           for less than a full range of sedentary work, with no

6           sustained work for an eight-hour work day, five-day work

7           week or an equivalent work schedule, due to the combination

8           of mental and physical impairments.  The ALJ noted that his

9           finding was reinforced by Dr. Lo's opinion, the objective

10          signs and findings and the claimant's own credible

11          subjective symptoms. (AR 236-241.)

12    41.   LINA referred the file for medical peer review to R. Norton

13          Hall, M.D.  Dr. Hall is a neurosurgeon, Board-certified in

14          Forensic Medicine and Quality Assurance, and a

15          Board-certified Medical Examiner. (AR 189-190.  Dr. Hall

16          noted that the medical records failed to reveal documented

17          significant clinical findings to support the imposed

18          restrictions.  Dr. Hall observed that Dr. Gross' consult on

19          6/1/07 had revealed a normal neuromuscular exam, with the

20          exception of some minor subjective restricted flexion at the

21          waist.  The MRI of the lumbar spine on 1/23/04 revealed

22          changes consistent with the claimant's age with no neural

23          compression.  The claimant's self-reported daily activities

24          supported a level of functionality that negated a status of

25          less than sedentary abilities. (AR 196-198.)  Based on the

26          appeal investigation, LINA upheld its decision to terminate

27          Seleine's claim, and this lawsuit followed.

28

**B.    Conclusions of Law**.

Seleine challenges LINA's denial of LTD benefits.

**1.    Jurisdiction and Venue**.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1).   Venue is proper in the Central District of California as the District in which the claim arose and in which Defendant may be found.

**2.    Standard of Review**.

A court reviews a denial of ERISA benefits *de novo*, unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 109 S. Ct. 948 (1989)   The grant of discretionary authority must be "unambiguous," but "[t]here are no 'magic' words that conjure up discretion on the part of the plan administrator." <u>Abatie v. Alta Health</u>, 458 F.3d 955, 962 (9th Cir. 2006), quoting <u>Sandy v. Reliance Standard</u>, 222 F.3d 1202, 1207 (9th Cir. 2000).

**a.    The Appropriate Standard Is Abuse of Discretion**.

The Summary Plan Description ("SPD") uses unambiguous language to provide discretionary authority to LINA:

> "The plan administrator has delegated to Life
> Insurance Company of North America as claim
> administrator, the discretionary authority to
> interpret and apply plan terms and to make
> factual determinations in connection with its

16

1  review of claims under the plan. Such
2  discretionary authority is intended to include
3  but is not limited to, the determination of the
4  eligibility of persons desiring to enroll in or
5  claim benefits under the plan, the determination
6  of whether a person is entitled to benefits under
7  the plan, and the computation of any and all
8  benefits payments. The plan administrator has
9  also delegated to Life Insurance Company of North
10  America as claim administrator the discretionary
11  authority to perform a full and fair review, as
12  required by the Employee Retirement Income
13  Security Act of 1974 ("ERISA"), of each claim
14  denial which has been appealed by the claimant or
15  his/her duly authorized representative."

16

17  Because the language in the SPD mirrors the Supreme Court's
18  pronouncement in Firestone, the Court finds that the Plan contains
19  sufficient language to confer discretion upon LINA, warranting
20  application of a deferential standard of review to LINA's decisions.
21  When reviewing for abuse of discretion, the administrator's
22  decision must be supported by the record. However, LINA need not
23  demonstrate the validity of its decision by a preponderance of the
24  evidence. See Voight v. Metropolitan Life Ins. Co., 28 F.Supp.2d 569,
25  576 (C.D. Cal. 1998)(citing Sandoval v. Aetna Life & Casualty Ins.
26  Co., 967 F.2d 377, 382 (10th Cir. 1992)). Rather, Seleine has the
27  burden of proving that LINA's decision was arbitrary and capricious.
28  St. Mary Medical Center v. Cristano, 724 F.Supp. 732, 742 (C.D. Cal.

1989).

An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact.  Bendixen v. Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999); Boyd v. NFL Players Retirement Plan, 410 F.3d 1173 (9th Cir. 2005).

In circumstances where the plan administrator is also the funding source for the plan, this structural conflict of interest must be weighed as a factor in determining whether the administrator's decision was reasonable.  Metropolitan Life Insurance Company v. Glenn, 128 S.Ct. 2343, 2351 (2008); Abatie, supra, 458 F.3d at 905. The significance of the conflict factor in a particular case varies and depends on the specific facts involved.  Under Abatie, supra, "the level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history."  458 F.3d at 968.

The Court has thoroughly reviewed the evidence and considered the issue of conflict of interest.  The Court finds there is no evidence that LINA should face closer scrutiny.  After remand by the District Court in Seleine I, LINA reviewed Seleine's claim under the Policy's "any occupation" standard.  LINA paid the claim through the "own occupation" period and commenced payment under the "any occupation" period during its investigation.  LINA obtained all updated medical records and physical ability assessment forms from Seleine's doctors, conducted a nurse review of those records, and ordered surveillance

and an IME.   LINA solicited input from Seleine's doctors on both the IME and the surveillance.   LINA also commissioned a comprehensive peer review by a Board-certified physician, and conducted a vocational analysis, including a transferrable skills analysis.   LINA determined that Seleine was not entitled to "any occupation" benefits.   On her appeal from that determination, LINA considered a neurosurgical consult report by a doctor retained by Seleine's lawyer, and had that report peer reviewed by a neurosurgeon.

"Review under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" <u>Concrete Pipe & Products, Inc. v. Constr. Laborers Pension Trust</u>, 508 U.S. 602, 623, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539, 564 (1993).   The review of medical evidence "is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence." <u>Jordan v. Northrop Gruman</u>, 370 F.3d 869, 880 (9th Cir. 2003).   Here, the Court finds no clear error.   As explained in more detail below, the Court finds that LINA's decision on Seleine's claim was fair and reasonable.

> **3.   <u>The Court Finds There Was a Reasonable Basis for LINA's Decision</u>.**
>
> **a.   <u>Seleine Did Not Satisfy the Definition of Total Disability Beyond November 30, 2006</u>.**

The review of an ERISA benefit determination begins with the relevant Plan language. <u>Aboul-Fetouh v. Employee Benefits Committee</u>, 245 F.3d 468 (5th Cir. 2001).   Here, benefits were paid through November 30, 2006.   Entitlement to further benefits must be proven by Seleine under the Policy definition of disability.

1    ERISA rules of construction govern the interpretation of the term
2    "total disability."   Accordingly, the burden of proof is on the
3    insured to show that she is totally disabled under the Policy
4    definition.   See, e.g., Papczynski v. Connecticut General Life Ins.
5    Co., 730 F. Supp. 410, 413 (M.D. Fl. 1990) aff'd, 923 F.2d 866 (11th
6    Cir. 1991); Heighley v. J.C. Penney Life Ins., 257 F. Supp. 2d 1241
7    (C.D. Cal. 2003); Horton v. Reliance Standard Life Ins. Co., 141 F.3d
8    1038, 1040 (11th Cir. 1998).

10                **b.   Seleine Was Required to Demonstrate Both an**
11                     **Injury and a Resulting Incapacity to Perform All**
12                     **the Duties of Any Occupation**

13    The Policy defines the phrase "totally disabled" to mean (after
14   24 months for Class 2 employees such as Seleine) that because of
15   Injury or Sickness, she "is unable to perform all the material duties
16   of any occupation for which [s]he is or may reasonably become
17   qualified based on [her] education, training or experience."
18   Therefore, to establish total disability within the meaning of the
19   Policy, Seleine must establish both an injury and a resulting
20   incapacity to perform all the material duties of any occupation for
21   which she is qualified.

22    The Policy prescribes a functional test for determining whether
23   the insured is "totally disabled."   Under such a functional test, the
24   Ninth Circuit has explained that:   "The mere existence of an
25   impairment is insufficient proof of disability.   A claimant bears the
26   burden of proving that an impairment is disabling."   *Matthews v.*
27   *Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).   Therefore, "The focus of
28   the analysis is on the degree to which the physical impairment has

hindered a worker's earning capacity." <u>St. Industrial Ins. System v.</u> <u>Bokelman</u>, 113 Nev. 1116, 946 P.2d 179, 182 (1997). <u>See also</u>, <u>Greene</u> <u>v. Metropolitan Life</u>, 924 F.Supp. 351, 360 (D.R.I. 1996), (". . . whether or not Greene could perform her job duties was the relevant question in determining her eligibility under the disability plan, not simply being diagnosed with CFS.")

In order to identify the restrictions and limitations imposed by Seleine's condition, LINA considered all available evidence and medical records from her treating physicians, the results of surveillance, and the IME conducted by Bruce Hector, M.D.  Dr. Hector reviewed all medical records and objective tests, took a comprehensive history, and conducted a physical exam of Seleine.

The IME noted that the objective testing (MRI, x-ray, etc.) revealed only mild, age-related degenerative changes.  Although the MRI showed some disc bulging, a high percentage of asymptomatic individuals have similar findings, and in Seleine's case, there was no evidence of nerve root impingement or other neurological findings to medically explain her complaints.

The IME also observed that Seleine was planning a career change as early as June 2002, at which time she told her physician, Dr. Lo, that she was going to school, and wanted "to extend her disability" even though she was feeling better, and was taking only Xanax 2-3 times per week (for anxiety).  She told Dr. Lo in March 2003 that she was attending school to become a teacher.  This suggests to the Court a reason other than disability for Seleine not returning to the work force.

The IME noted that Seleine had been relying solely on passive care treatment of her symptoms.  One would expect to see more

aggressive treatment of severe, debilitating symptoms, as even Seleine's own doctors have recognized.  In support of her claim, Seleine relies heavily upon intensive chiropractic treatment, but it is clear from the records that her initial treatment by the chiropractor (Dr. Scott) was not prompted by pain, which she self-reported as 1 on a 1-10 scale.  Nevertheless, the chiropractic adjustments continued for years.

While giving her history to the IME doctor, Seleine sat without frequent position changes or facial expressions for 40 minutes and exhibited no pain behavior.  She got on and off the examination table without difficulty.  She was able to bend, stoop and squat.  The IME observed no difficulty in Seleine's walking, transfer movements, or continuous sitting.  He observed no pain behavior at any time during the exam.  The IME doctor concluded that Seleine was capable of performing full-time work at an ergonomic work station, and that her significant subjective complaints were grossly disproportionate to the objective findings.  He believed there was a reasonable medical probability that Seleine exerted less than full effort while performing strength assessment during the evaluations, and that the sole cause of any reduction in her physical capacity was deconditioning.

LINA attempted to contact Seleine's treating physicians during the review of her claim, but was unsuccessful.  LINA later learned that Seleine's lawyer had instructed her doctors not to speak with LINA's doctors.

LINA's claims investigation also included a review of the medical records by a medical peer reviewer, who noted that Seleine's symptoms and reported abilities were out of proportion to her objective

findings, as evidenced by a lack of neurologic deficits.  Her MRI was essentially normal, describing "very mild" stenosis, and age-related degenerative changes.  According to the peer reviewer, she was able to perform a full-time sedentary position.

In order to identify potentially suitable occupations within Seleine's restrictions and limitations based on her education, training and experience, LINA conducted a vocational review.  The centerpiece of the vocational review was the Transferable Skills Analysis ("TSA"), which identified three suitable occupations of detail drafter, examiner (government services), and architectural drafter.  All these occupations are sedentary in nature, which Seleine is capable of performing within her physical restrictions and limitations.

On appeal, Seleine visited a neurosurgeon, Dr. Gross, at the behest of her lawyer.  LINA ordered a peer review of the Gross report by a neurosurgeon, R. Norton Hall, M.D.  Dr. Hall concluded that the medical records failed to reveal documented significant clinical findings to support the imposed restrictions.  LINA's medical peer review concluded that Seleine's self-reported daily activities supported a level of functionality that would enable her to perform the duties of a sedentary occupation.

LINA was not required to accept the unsupported conclusions and opinions in the medical reports submitted by Seleine.  Under ERISA, an administrator is not free to accept a conclusion in a medical report without considering whether that conclusion follows logically from the underlying medical evidence.  Abram v. Cargill, Inc., 395 F.3d 882, 887 (8th Cir. 2005).  LINA was duty bound to conduct its independent investigation of Seleine's disability claim.  It was not required to

accept the opinions of Seleine's treating physician or one hired by her lawyer. Black & Decker v. Nord, 538 U.S. 822, 123 S. Ct. 1965, 155, L.Ed.2d 1034 (2003).

Seleine argues that LINA ignored Seleine's subjective complaints and/or the opinions of her doctors. However, the Court finds that LINA simply reached a different conclusion on the issue of disability, and that LINA's conclusion was the product of a full and fair review. The records of Seleine's attending physicians primarily document her subjective complaints. Seleine's attempts to elevate these notes of a patient's self-report to the status of "findings" is inappropriate. Doctors have an obligation to record the symptoms complained of by their patients. LINA did not ignore Seleine's subjective complaints of pain. Rather, these complaints were subject to verification by objective medical evidence. LINA was under no obligation to accept them at face value. Additionally, the Court observes that Seleine's activities - cooking, cleaning, shopping, laundry, regular exercise, etc. - are inconsistent with her claims of severe and debilitating pain.

Seleine also criticizes LINA for relying too heavily on the objective evidence (or lack thereof). However, numerous Courts have concluded that an administrator does not abuse its discretion by requiring objective evidence of an inability to function in the workplace. Desrosiers v. Hartford Life, 515 F.3d 87, (1st Cir. 2008); Corry v. Liberty Life, 499 F.3d 389 (5th Cir. 2007); Johnson v. Metropolitan Life, 437 F.3d 809, 814 (8th Cir. 2006); Pralutsky v. Metropolitan Life, 435 F.3d 833, 839-40 (8th Cir. 2006) cert. denied, 127 S. Ct. 264 (2006); and Kushner v. Lehigh Cement Co., 527 F.Supp.2d 1182, 1191-1192 (C.D. Cal. 2008).

As these cases confirm, a Plan need not contain the words "objective evidence" of disability to apply this test. The administrator need only retain discretion to interpret the Plan terms. Cooper v. LINA, 486 F.3d 157, 166 (6th Cir. 2007); Booth v. AT&T LTD Plan, 2008 WL 906625 (D. Ariz. 2008); Kushner, supra *9 (administrator with discretion entitled to independently investigate whether there is evidence to support claim). Here, the Plan required Seleine to provide "satisfactory proof" of disability, and LINA was granted the discretion to interpret Plan terms accordingly.

The Court finds that the opinions of Seleine and her doctors are insufficient by themselves to establish disability under the Plan requirements and case law. Treating physicians are more or less required to accept the representations of their patients, but LINA, as an ERISA administrator, is not obligated to do so.

In response to the conclusions of LINA's reviewing physicians that the objective evidence does not support disability, Seleine points to the MRI results from 1996. However, the 1996 MRI contains only minor findings - asymptomatic in most individuals. Further, there was no change in the findings when Seleine's MRI was repeated in 2004. And, the record demonstrates that Seleine worked full-time for over six years after the 1996 films were taken.

Given the contradictory medical evidence in the file, it was not an abuse of discretion for LINA to deny benefits. See, Lown v. Continental, 238 F.3d 543, 546 (4th Cir. 2001) (upholding denial of LTD benefits for chronic fatigue and pain despite three treating physicians' opinions where insurer "determined that [claimant's] documentation was inadequate to prove a total disability because of the lack of test results or other objective evidence to support the

1   disability."); Voight v. Metropolitan Life, 28 F.Supp.2d at 578
2   (finding insurer justified in denying subjective claim where treating
3   physicians' opinions suffered from a lack of diagnostic precision and
4   objective support).

5       Seleine's arguments fail to demonstrate that LINA abused its
6   discretion or that its challenged decision was unreasonable.  Seleine
7   argues that Dr. Hector's conclusions are based on nothing more than an
8   invalid premise - that others are asymptomatic with these findings and
9   that therefore, Seleine is also asymptomatic.  However, Dr. Hector
10  simply stated that because most individuals are asymptomatic with
11  these same findings, the findings themselves are not conclusive proof
12  of a disabling condition.  The Court agrees with this assessment.  The
13  x-rays and MRIs reflect age-related degenerative changes.  The Court
14  also finds it significant that Dr. Hector observed Seleine during the
15  IME.  She had no difficulty walking, transferring, sitting for 40
16  minutes, and she exhibited no pain behavior.

17      Seleine argues that it was an abuse of discretion for LINA to
18  consider the results of the initial FCE conducted as part of its
19  vocational review under the "own occupation" standard.  In the first
20  trial, the District Court characterized that FCE as "contradictory and
21  ambiguous" because it failed to explain why Seleine did not give her
22  best effort during the exam.  Guided by the Court's Order and comments
23  on this issue, and given the change to the "any occupation" standard,
24  LINA conducted a more comprehensive evaluation of functional capacity
25  as part of its "any occupation" investigation.  This investigation
26  included two peer reviews, an IME, additional surveillance, and a
27  Transferrable Skills Analysis ("TSA").  The IME cleared Seleine for
28  light work and noted her subjective complaints were grossly

disproportionate to the objective findings.  LINA then ordered a peer review to clarify her functional capacity and she was cleared for a sedentary position.    A vocational analysis was conducted, which identified three occupations she could perform within her existing restrictions and limitations.    LINA did what the District Court suggested, with particular attention to an additional vocational review.

### c.    The District Court's Ruling in Seleine I.

Seleine argues that it was an abuse of discretion for LINA not to find her totally disabled, given the District Court's ruling in Seleine I.  However, the only issue presented in Seleine I was whether Seleine qualified for benefits under the Plan's "own occupation" definition of disability.  The Court ruled in favor of Seleine and, consistent with ERISA procedure, remanded to the administrator to determine whether she qualified for benefits under the Plan's "any occupation" definition of disability.

In a similar vein, Seleine argues it was an abuse of discretion for LINA to rely on the same medical evidence gathered during its "own occupation" investigation in adjudicating her "any occupation" claim after remand because the Court ruled against LINA in the first trial.  However, it was appropriate for LINA to consider all medical evidence in reaching its determination here.  Additionally, while LINA's "any occupation" investigation necessarily included consideration of _all_ medical evidence, including the evidence gathered during the "own occupation" investigation, the "any occupation" determination was based on a significant amount of additional evidence.  After remand of this case, LINA obtained updated medical records and Physical Ability

Assessment forms from Seleine's doctors.  It conducted a peer review by a Board-certified doctor and a new vocational review.  It conducted an independent medical examination and a further specialist peer review by a neurosurgeon to analyze the report by the neurologist that Seleine's lawyer hired to examine her during the remand.  LINA did exactly what the District Court ordered:

> "Defendant has never been given the opportunity to determine whether Plaintiff is disabled under the Any Occupation Standard.  Consequently, we REMAND this matter so that Defendant may make a benefit determination under the Any Occupation Standard."

Finally, Seleine appears to contend that LINA abused its discretion in not accepting the SSA benefit payment to conclusively establish her total disability under the Policy.  The Ninth Circuit has long held, however, that an SSA award is not binding on an administrator.  <u>Madden v. ITT Long Term Disability Plan</u>, 914 F.2d 1279, 1285 (9th Cir. 1990); <u>Daic</u>, 2008 WL 3862074 *2; <u>Moskowite v. Everen Capital Corp.</u>, 2005 WL 1910941 *4 (N.D.Cal. 2005)(encouraging claimant to apply for SSA benefits is not grounds for judgment in claimant's favor).

To bind an administrator to the SSA determination of disability would strip fiduciaries of their administrative discretion.  The SSA "test" for disability is not applicable to claims under the LINA Policy.  In SSA cases, the agency is obligated to apply the "treating physician rule," which gives greater weight to a treating physician's opinions, unless rejected by specific substantial evidence in the record.  <u>Butler v. Shoemake</u>, 173 F.Supp.2d 1069, 1076 (D. Or. 2001).

The Supreme Court has confirmed that ERISA plan administrators, like LINA, have no such obligation. *Nord*, 538 U.S. at 834.  Additionally, the SSA uses a different test for disability, and it is unknown what evidence the SSA relied on in Seleine's case to reach its determination.

Based on the above, the Court finds the determination by LINA that Seleine was entitled to no further disability benefits after November 30, 2006 was reasonable and supported by the evidence, and not an abuse of discretion.  Substantial evidence exists in the record to support that determination.

The Court further finds that even if the Court had conducted a de novo review, LINA's decision to terminate benefits to Seleine on November 30, 2006 was reasonable, correct, and supported by the evidence.

In light of the foregoing, the Court finds that LINA did not abuse its discretion by denying Seleine's claim for LTD benefits.

**<u>CONCLUSION</u>**

Accordingly, and for the foregoing reasons, the Court **GRANTS** judgment in favor of Defendant.

DATED:  February 11, 2009      _____/s/_____

VICTOR B. KENTON
UNITED STATES MAGISTRATE JUDGE